# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BRANDON MILL, LLC<br>201 Smythe Street<br>Greenville, South Carolina 29611<br><br>~AND~<br><br>H. PACE BURT, JR.<br>539 N. Westover Boulevard<br>Albany, Georgia 31707<br><br>            *Plaintiffs,*<br><br>                v.<br><br>FEDERAL DEPOSIT INSURANCE<br>CORPORTATION<br>AS RECEIVER FOR FIRST NBC BANK<br>550 17th Street, NW<br>Washington, DC 20429<br><br>        <u>Serve:</u><br>        Jelena McWilliams<br>        550 17th Street, NW<br>        Washington, DC 20429<br><br>            *Defendant.* | Civil Action No. |

## COMPLAINT

***COME NOW*** Plaintiffs by and through undersigned counsel, and respectfully submit their Complaint, and for this cause of action state:

## PARTIES

1. Plaintiff Brandon Mill, LLC is a corporation existing under the laws of the state of South Carolina with its principle place of business in South Carolina.

2. Plaintiff H. Pace Burt, Jr. is an adult resident of the state of Georgia.

3. Defendant Federal Deposit Insurance Corporation (hereinafter referred to as "FDIC") is a government corporation and instrumentality of the United States of America with its headquarters in Washington, D.C.

## JURISDICTION & VENUE

4. Jurisdiction and venue are proper in this Court pursuant to 12 U.S.C. §1821(d)(6)(A)(2).

5. All conditions precedent to bring this suit have been satisfied.

## BACKGROUND

6. Mr. H. Pace Burt, Jr. is a real estate developer with an established record of successfully purchasing, renovating and operating historic properties.

7. Mr. Burt locates historically significant properties and purchases them through single-purpose investment entities, typically limited liability companies or "LLCs." Mr. Burt then applies for the properties to be listed on the National Register of Historic Places, if they are not already on the list.

8. Once the properties are designated as historic properties, Mr. Burt, acting through LLCs, renovates and preserves the properties, putting them to suitable commercial purposes, such as loft apartments and/or retail space. All such renovation and preservation work is performed under the watchful eye and with the approval of the National Park Service.

9. By preserving and renovating historically significant properties, Mr. Burt's LLCs generate tax credits as provided for by state and federal law, including the tax credit allowable pursuant to 26 U.S.C. §47 for qualified rehabilitation expenditures incurred in connection with the certified rehabilitation of a certified historic structure.

10. Mr. Burt seeds these projects by investing his own money, often amounts in excess of $1 million.

11. To obtain construction financing for these projects, Mr. Burt will cause the LLCs to borrow money from commercial lenders, who require Mr. Burt's personal guaranty.

12. Once the projects have been rehabilitated and reach 80% occupancy, they are eligible for permanent financing. The LLCs then refinance their construction loans on more favorable terms, including a fixed interest rate and without the requirement of a personal guaranty from Mr. Burt.

13. Additional financing for the projects is obtained by inviting investors to purchase membership interests in the LLCs. Some investors purchase membership interests in the LLCs for the purpose of acquiring the tax credits described in Paragraph 4 above. These investors are referred to as the "investor member" in the LLCs.

14. It is not intended that the investor members will have an ownership interest in the LLCs for longer than 5 years, which is the recapture period for the tax credits provided for under the Internal Revenue Code.

15. At the end of the 5-year recapture period, the investor members' interest in the profits of the LLCs decreases materially, usually to 10% or less, reflecting the fact that the investor members' primary interest in the projects is in obtaining the tax credits. Furthermore, the LLCs may repurchase the investor members' interests in the LLCs at a price that reflects the investor members' significantly reduced interest in the LLCs.

16. Investor members in the LLCs typically do not become involved in the day-to-day operations of the LLCs. But, they do have the right to approve major decisions involving the LLCs, e.g. the LLCs must obtain the consent of the investor member to incur and/or refinance debt.

17. For his part, Mr. Burt or an entity designated by him receives a developer's fee for putting the projects together. This fee is a bona fide expense of the projects, is necessary to the tax credits received by the investor members in the LLCs, and must be paid by the LLCs. If the developer

fee is not paid, it can force the recapture of all or a portion of the tax credits taken by the investor members.

## MR. BURT'S HISTORY OF DEALINGS WITH FIRST NBC BANK

18. First NBC Bank has been an investor member in LLCs created by Mr. Burt in the past. For example, First NBC Bank was the investor member in the LLCs that rehabilitated and operate (i) the historic Schuyler Building located in Spartanburg, South Carolina and (ii) the historic Mobile Towers building located in Mobile, Alabama.

19. At all times prior to April 2017, Mr. Burt and the LLCs had good working relationships with First NBC Bank. Because First NBC Bank was always an investor member in the LLCs, it did not participate in the day-to-day operations of the LLCs. However, First NBC Bank faithfully discharged its obligations to the LLCs and their members and managers, providing consents as appropriate, including timely consent to the LLCs incurring and refinancing debt.  For example:

20. In November 2015, First NBC Bank responded to a request to refinance the debt on the Schuyler Building within 48 hours.

21. In December 2015, First NBC Bank responded to a request to refinance the debt on Mobile Towers within 24 hours.

22. It was and is critical that investor members in the LLCs promptly respond to requests to review and consent to the refinancing of debt by the LLCs in these situations. Typically, the LLCs are attempting to refinance millions of dollars in construction debt that (i) was never intended to be permanent financing, (ii) carries a floating or variable interest rate, which exposes the LLCs to interest rate risk, (iii) carries an interest rate higher than the rate that can be obtained through permanent financing and (iv) is recourse debt personally guaranteed by Mr. Burt, unlike permanent financing, which is typically non-recourse financing that is not guaranteed by Mr. Burt. First NBC Bank understood the importance of promptly responding to such requests, and it had always done so.

**THE WEST VILLAGE LOFTS AT BRANDON MILL**

23. Following the business model described above, Mr. Burt located a historic textile mill in Greenville, South Carolina that he intended to preserve and renovate using the business model described above. The mill was called "Brandon Mill," and Mr. Burt planned to convert the property into loft apartments, which are now called the West Village Lofts (the "Brandon Mill Project" or the "Project").

24. To that end, in 2015, Mr. Burt formed several LLCs to own, operate and generate tax credits for the Project.

25. **The Owner:** Brandon Mill, LLC was formed to own, develop, rehabilitate, renovate, operate, improve, finance, lease, manage, subdivide and eventually sell or exchange real property located at 25 Draper Street in Greenville, South Carolina.  In other words, Brandon Mill, LLC was to be the owner of the Brandon Mill Project and will hereafter be referred to as "Mill Owner." Mill Owner has two members: Brandon Mill Tenant, LLC and Brandon Mill Investor, LLC.

26. **The Tenant:** Brandon Mill Tenant, LLC was formed for the purpose of leasing, holding, maintaining and operating the historic property located at 25 Draper Street in Greenville, South Carolina. In other words, Brandon Mill Tenant, LLC was to be the lessee of the Brandon Mill Project and will hereafter be referred to as "Mill Tenant." Mill Tenant was also the entity that would be the recipient of the tax credits generated by the Brandon Mill Project.

27. **The Manager:** Brandon Mill Manager, LLC was formed to be the manager of Mill Tenant and will hereafter be referred to as "Mill Manager." Mr. Burt is the manager of and owns a 45% membership interest in Mill Manager.

28. Collectively, Mill Owner, Mill Tenant and Mill Manager are referred to as the "LLCs" henceforth.

29. Although the LLCs are all separate and distinct legal entities, they are bound by interrelated contractual obligations and serve a single purpose, i.e. to make the Brandon Mill Project a financial success for all parties involved, including Tax Partners (as defined below) and Mr. Burt.

30. Mr. Burt seeded the Brandon Mill Project with $1 million in personal funds and is due a developer's fee of $2.5 million from Mill Owner.

31. In order to finance the construction and rehabilitation of the Brandon Mill Project, in 2015, Mill Owner borrowed $18 million from BB&T (the "BB&T Construction Loan"). The BB&T Construction Loan was not permanent financing. It carried a floating interest rate and was secured by not only the real estate on which the Brandon Mill Property was located, but also other properties owned or controlled by Mr. Burt worth over $6 million. Mr. Burt was also required to personally guaranty the BB&T Construction Loan.

## FIRST NBC'S INVESTMENT IN THE BRANDON MILL PROJECT

32. First NBC Bank was interested in investing in the Brandon Mill Project and became an investor member in Mill Tenant. At all times relevant hereto, Mill Tenant had two members: Mill Manager which is described above, and First NBC Historic Tax Partners, LLC ("Tax Partners"), which was owned and controlled by First NBC Bank.

33. Tax Partners is a Louisiana limited liability company and is the Investor Member of Mill Tenant. Tax Partners' primary motivation for investing in Mill Tenant was to obtain the tax credits generated by the Brandon Mill Project. After the expiration of the 5-year recapture period for those tax credits, Tax Partners' interest in Mill Tenant will decrease dramatically, from 90% to 10%. And, under a put agreement, Tax Partners will be entitled to sell its interest in Mill Tenant to Mill Manager after the 5-year recapture period and for fair market value. However, that value will be based on Tax Partners' reduced interest in Mill Tenant, i.e. 10%, not 90%.

34. As a member of Mill Tenant and having a vested interest in the success of the Project, Tax Partners owed duties of reasonable case, fiduciary duties and duties of good faith and fair dealing to the LLCs and Mr. Burt.

35. Mill Tenant's operations are governed by a written operating agreement. Under the terms of the operating agreement, the Managing Member, which is Mill Manager, is responsible for all aspects of the day-to-day operations of Mill Tenant. However, Mill Manager's authority is not unlimited. For example, Mill Manager cannot cause Mill Tenant to incur debt without the consent of the Investor Member, i.e. Tax Partners.

36. Other protections for Tax Partners were also built into the documents governing the Brandon Mill Project. For example, under the Master Lease between Mill Owner and Mill Tenant, Mill Owner could not refinance the BB&T Construction Loan without the consent of Tax Partners. Similarly, under Paragraph 5.2 of Mill Owner's Operating Agreement, Mill Tenant's consent is required for Mill Owner to refinance the BB&T Construction Loan, and Tax Partners had the power to withhold that consent. However, Tax Partners must exercise these powers in a manner that is consistent with its duties described in Paragraph 22 above.

37. In early February 2017, the Brandon Mill Project achieved 80% occupancy, which meant that the Project was stabilized and eligible for permanent financing to refinance the BB&T Construction Loan. For reasons previously explained, it was advantageous for Mill Owner to refinance its debt in this way. Accordingly, Mr. Burt and Mill Owner began looking for opportunities to refinance the BB&T Construction Loan.

## THE FDIC BECOMES THE RECEIVER FOR FIRST NBC BANK AND TAKES OVER THE OPERATIONS OF TAX PARTNERS

38. On or about April 28, 2017, the Louisiana Office of Financial Institutions closed First NBC Bank, and the Federal Deposit Insurance Corporation (the "FDIC") was named Receiver for First NBC Bank.

39. Shortly thereafter, Brad Calloway, who had been employed by First NBC Bank and was retained and employed by the FDIC, officially notified Mill Tenant and Mill Manager that, in its capacity as Receiver for First NBC Bank, the FDIC would be operating and acting for Tax Partners. As such, the FDIC succeeded to and assumed the fiduciary duties and duties of good faith and fair dealing described above.

40. Consistent with its mandate as Receiver, the FDIC began looking for ways to liquidate the assets of First NBC Bank, including Tax Partners. Accordingly, in May 2017, Mr. Calloway, acting on behalf of the FDIC, asked Mill Manager to make an offer to purchase Tax Partners' membership interest in Mill Tenant.

41. On or about May 25, 2017, in response to the inquiry described in the preceding paragraph, Mill Manager offered to purchase Tax Partners' interest in Mill Tenant for $90,162.50. This offer price was calculated based on a number of factors, including the income that Tax Partners could be expected to receive as a result of its interest in Mill Tenant and the reduction in Tax Partners' interest in the profits of Mill Tenant that would take place after the 5-year recapture period expired.

42. The FDIC did not respond to this offer.

## THE FDIC REFUSES TO COOPERATE
## WITH THE REFINANCING OF MILL OWNER'S DEBT

43. In April and June 2017, Mr. Burt and Mill Owner received terms sheets from Arbor Commercial Funding ("Arbor") reflecting the terms on which Arbor would provide Mill Owner with permanent financing to refinance the BB&T Construction Loan.

44. The Arbor terms sheets were very favorable for Mill Owner, particularly the June terms sheet, which contained the following terms: (i) $20 million principal, which was necessary to refinance the $18 million balance of the BB&T Construction Loan, repay Mr. Burt's initial $1 million investment in the project and cover the $2.5 million developer's fee, (ii) a projected interest rate of 3.96%, which fell to as low as 3.85% during the summer of 2017, and (iii) non-recourse financing, i.e. Arbor did not require a personal guaranty from Mr. Burt. The Arbor terms sheet was also very favorable to Mill Tenant and Mill Manager, because it would place the Brandon Mill Project on secure financial footing and help ensure the financial success of the Project.

45. Over the summer of 2017, Mr. Burt and Mill Owner made repeated requests that the FDIC, in its capacity as Receiver for First NBC Bank, give Tax Partners' consent to proceed with refinancing the BB&T Construction Loan on the terms set forth in the Arbor terms sheet. These requests included information and documentation that would enable the FDIC to properly evaluate and consider the requests for consent to the refinancing.

46. Despite repeated inquires and prodding, the FDIC did not respond to Mr. Burt's or Mill Owner's requests for consent to the Arbor terms sheet and the refinancing of the BB&T Construction Loan in the summer of 2017. The FDIC acknowledged receiving these requests, understood the urgency of the requests and did not request additional information regarding the Arbor terms sheet.

47. The FDIC purposefully and intentionally took no action whatsoever and delayed providing consent.

48.     At the time, the FDIC's behavior was negligent, because refinancing the BB&T Construction Loan would significantly benefit all persons and entities involved with the Project, as explained above.

49.     At this time, FDIC still had contractual and fiduciary obligations to the LLCs.

50.     With the FDIC's and Tax Partners' consent, Mill Manager and Mr. Burt would have refinanced the BB&T Construction Loan with Arbor at a fixed rate of 3.96% for 10 years and without Mr. Burt's personal guaranty.

51.     As a result of the FDIC's failure and refusal to give its consent to the Arbor terms sheet, Mill Owner could not secure refinancing through Arbor and lost the ability to lock in the very favorable terms described above. The FDIC's failure and refusal to consent to refinancing on those terms caused economic damage to Mill Owner, its members, and Mr. Burt.

52.     In September 2017, Mill Manager and Mr. Burt began to suspect that the FDIC was using its power to block the refinancing of the BB&T Construction Loan as leverage to secure a better offer from Mill Manager to buy out Tax Partners' membership interest in Mill Tenant, i.e. the FDIC would consent to the refinancing of Mill Owner's debt only if Mill Manager agreed to pay substantially more for Tax Partners' interest in Mill Owner than it was actually worth, which was a breach of its fiduciary duties and duties of good faith and fair dealing.

**MILL OWNER OBTAINS ALTERNATIVE FINANCING
BUT THE TERMS ARE SIGNIFICANTLY LESS FAVORABLE**

53.     By failing to refinance the BB&T Construction Loan, Mill Owner was also subject to interest rate risk, i.e. if interest rates suddenly spiked, then the costs of Mill Owner's debt service would also increase, potentially putting the entire Project at risk.

54.     At the time, it was not easy to find lenders willing to provide permanent financing to pay off the BB&T Construction Loan. Mr. Burt has had a long and successful history of dealings with Synovus. So, in the fall of 2017, he approached Synovus, hoping that his reputation as an excellent

customer would allow him to secure refinancing of the BB&T Construction Loan on more favorable terms.

55. On or about October 2, 2017, Mr. Burt and Mill Owner secured an alternative commitment to refinance the BB&T Construction Loan from Synovus (the "Synovus Commitment"). The terms of the Synovus Commitment were not nearly as advantageous as the Arbor terms sheet. Specifically, but not exclusively, the Synovus Commitment was for only $18 million, carried an interest rate of 4.15% and required Mr. Burt's personal guaranty.

56. Three days later, on October 5, 2017, Mill Owner shared the Synovus Commitment with the FDIC and requested the FDIC's consent to proceed with refinancing the BB&T Construction Loan.

57. The FDIC responded by promising to consider the Synovus Commitment, but tied that issue to the terms on which Tax Partners would "exit" the deal, i.e. the purchase of Tax Partners' interest in Mill Tenant.

58. The FDIC's attempt to tie these issues, i.e. consent to refinancing with the purchase of Tax Partners' interest in Mill Tenant, further caused Mr. Burt and Mill Owner to suspect that the FDIC was using its power to block the refinance of Owner's debt to leverage a better, and unrealistic, price, for Tax Partners' interest in Mill Tenant. As a result, Mr. Burt threatened to assert legal claims against the FDIC if it did not consent to the Synovus Commitment.

59. Finally, on October 23, 2017, and only after having been threatened with legal action, the FDIC, acting as the Manager for Tax Partners, belatedly consented to Mill Owner pursuing a refinancing of the BB&T Construction Loan via the Synovus Commitment.

**THE FDIC ABUSES ITS POWER AND
THREATENS MR. BURT AND MILL OWNER**

60. Despite giving its consent to the Synovus Commitment, the FDIC continued to use improper leverage in an attempt to force Mill Manager to buy out Tax Partners' interest in Mill Tenant at an excessive price. Specifically, on or about November 7, 2017, the FDIC, acting through its agent, Randy German:

   a. Demanded that Mill Manager "start negotiations" for Tax Partners' interest in Mill Tenant at "$6 million to $10 million," which is far in excess of its value.

   b. Told Mr. Burt that if Mill Manager refused to negotiate in the $6 million to $10 million range, then the FDIC would "make [Mr. Burt's] life miserable."

   c. Told Mr. Burt that the "FDIC would audit him to death."

   d. Threatened to "auction off" Tax Partners' position in Mill Tenant, from which Mr. Burt inferred a threat to sabotage the refinancing of the BB&T Construction Loan.

61. On January 30, 2018, Mill Owner closed on a loan from Synovus (the "Synovus Loan") and thereby refinanced its debt and the BB&T Construction Loan. The terms of the Synovus Loan are as follows: $18 million in principal, with a five-year interest rate lock at 4.15%. Consistent with the terms of the Synovus Commitment, Mr. Burt was also required to and did personally guaranty the entire amount of the Synovus Loan. Because the Synovus Loan is only for $18 million, Mill Owner does not currently have the capital necessary to fund the $2.5 million developers fee.

62. While the terms of the Synovus Loan are an improvement over the terms of the BB&T Construction Loan, they are not as good as the terms that Mill Owner could have obtained if the FDIC had complied with its duty to exercise ordinary care, its fiduciary duties and its duties of good faith and fair dealing and had given its consent to the Arbor terms sheet described above.

63. The FDIC acted negligently and/or breached its fiduciary duties and its duties of good faith and fair dealing to the LLCs and Mr. Burt by virtue of:

   a. Failing to timely review the Arbor terms sheet described in Paragraph 32 above.

    b. Failing to consider and consent to the Arbor terms sheet described above.

    c. Attempting to extort an exorbitant price for Tax Partners' interest in Brandon Mill, LLC by refusing to consent to the Arbor terms sheet described above.

    d. Making threats and actions described above.

    e. Failing to exercise reasonable care in the oversight and supervision of its employees and contractors who were acting for and on behalf of Tax Partners.

64. As a result of the negligence, breaches of fiduciary duty and good faith and fair dealing described above, Mill Owner has suffered significant economic damages.

65. Moreover, Mr. Burt has personally suffered emotional distress, anxiety, and other non-economic damage.

66. Furthermore, the FDIC's actions and omissions in failing to consent to the Arbor terms sheet has also proximately caused Mr. Burt to personally suffer material damages. Specifically, Mr. Burt was required to sell an income producing property known as Princeton Place Apartments in order to infuse capital into Mill Owner, which has economically harmed Mr. Burt.

## CLAIM I
## BREACH OF FIDUCIARY DUTY

67. Plaintiffs incorporate all preceding paragraphs as if restated herein.

68. Upon becoming Receiver for First NBC Bank, Defendant FDIC assumed the duties and obligations of First NBC Bank.

69. As a member of Brandon Mill, LLC, those duties and obligations included a fiduciary duty owed to Brandon Mill, LLC and the other members of Brandon Mill, LLC.

70. By failing to timely respond to the request to sign off on new financing, FDIC breached its fiduciary duty to Brandon Mill, LLC and Mr. Burt.

71. As a proximate cause of their breach of fiduciary duty, FDIC caused injury to Brandon Mill, LLC and Mr. Burt.

72.     The damages incurred as a proximate result of FDIC's actions include but are not limited to economic loss as detailed above.

## COUNT II
## BREACH OF CONTRACT

73.     Plaintiffs incorporate all preceding paragraphs as if restated herein.

74.     Upon becoming Receiver for First NBC Bank, FDIC assumed the duties and obligations of Frist NBC Bank, including those contained in the LLC's operating agreement.

75.     As a member of Brandon Mill, LLC, the duties and obligations contained in the operating agreement were owed to the LLC and all other members, including Mr. Burt.

76.     FDIC breached their contractual obligations to Brandon Mill, LLC and Mr. Burt.

77.     As a proximate cause of their breach this breach, FDIC caused injury to Brandon Mill, LLC and Mr. Burt.

78.     The damages incurred as a proximate result of FDIC's actions include but are not limited to economic loss as detailed above.

## COUNT III
## NEGLIGENCE

79.     Plaintiffs incorporate all preceding paragraphs as if restated herein.

80.     Upon becoming Receiver for First NBC Bank, FDIC assumed a duty to act in a reasonable manner to assure the economic success of Brandon Mill, LLC.

81.     Defendant FDIC breached that duty and failed to act in a reasonable way by, including but not limited to, failing to timely respond to requests to refinance the debt obligations, failing to understand its obligations under the LLC agreement, and failing to take reasonable steps to assure that Brandon Mill, LLC and all members of the LLC, including Mr. Burt, did not suffer economic injury.

82.     In breaching those duties, Defendant FDIC proximately caused Brandon Mill, LLC and Mr. Burt to suffer injury, including economic and non-economic, as described above.

## COUNT IV
## BREACH OF SOUTH CAROLINA
## UNIFORM LIMITED LIABILITY COMPANY ACT DUTY OF LOYALTY

83. Plaintiffs incorporate all preceding paragraphs as if restated herein.

84. Limited liability companies in South Carolina must adhere to that state's Uniform Limited Liability Company Act., South Carolina Code §§33-44-101, *et seq*.

85. Section 33-44-409 governs the relationship between members of limited liability companies.

86. That section includes a duty of loyalty that prohibits a member of a limited liability company from acting in a manner adverse to the limited liability company.

87. Defendant FDIC, though its agents, servants, and employees, breached this duty of loyalty by threatening and actually interfering with the refinancing of Brandon Mill, LLC as described above.

88. As a proximate cause of this breach of the FDIC's duty of loyalty, the FDIC caused injury to Brandon Mill, LLC and Mr. Burt.

89. The damages incurred as a proximate result of the FDIC's actions include but are not limited to economic loss as detailed above.

## COUNT V
## BREACH OF SOUTH CAROLINA
## UNIFORM LIMITED LIABILITY COMPANY ACT DUTY OF CARE

90. Plaintiffs incorporate all preceding paragraphs as if restated herein.

91. Limited liability companies in South Carolina must adhere to that state's Uniform Limited Liability Company Act., South Carolina Code §§33-44-101, *et seq*.

92. Section 33-44-409 governs the relationship between members of limited liability companies.

93. That section includes a duty of care that prohibits a member of a limited liability company from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

94. Defendant FDIC, though its agents, servants, and employees, breached this duty of care by threatening and actually interfering with the refinancing of Brandon Mill, LLC as described above in a manner that was grossly negligent, reckless, and intentional.

95. As a proximate cause of this breach of the FDIC's duty of care, the FDIC caused injury to Brandon Mill, LLC and Mr. Burt.

96. The damages incurred as a proximate result of the FDIC's actions include but are not limited to economic loss as detailed above.

WHEREFORE, Plaintiffs Brandon Mill, LLC and H. Pace Burt, Jr. respectfully request judgment be entered in their favor in an amount to be determined at trial, but well in excess of the jurisdictional minimum, including but not limited to economic loss, non-economic loss, attorneys' fees, plus costs of this suit, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Christopher T. Nace*
Christopher T. Nace, #977865
PAULSON & NACE, PLLC
1025 Thomas Jefferson St., NW
Suite 810
Washington, DC 20007
ctnace@paulsonandnace.com
202-463-1999 Tel.
202-223-6824 Fax
*Counsel for Plaintiffs*

**\*\*\*PLAINTIFFS DEMAND TRIAL BY JURY ON ALL COUNTS\*\*\***

*/s/ Christopher T. Nace*
Christopher T. Nace, #977865